UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 2:23-CR-00045-GSL-JEM |
| ROBERT CRAYTON et al. | |

### <u>OPINION AND ORDER</u>

Robert Crayton and Immanuel Woodberry were driving a rental car from Atlanta to Chicago when Lake County Indiana Sheriff's Detective Timothy Anderson pulled them over for speeding. Crayton, the driver, admitted to the infraction. Detective Anderson then asked Crayton to join him in his patrol car while he verified Crayton's driver's license and issued him a written warning. Crayton obliged, and Woodberry remained in the rental.

As Detective Anderson filled out the warning slip, he asked Crayton about his travel plans, which included flying from Chicago to Atlanta the day before, staying in Atlanta for a few hours, and then driving back to Chicago through the night. Detective Anderson found this suspicious, and so after completing the tasks related to the traffic stop, he asked Crayton if he could search the car. Crayton said no. Another officer, who arrived on scene during the travel plans discussion, then ran a drug-sniffing dog around Crayton's rental car. The dog alerted, and the officers found several sealed bags of cocaine. Crayton and Woodberry were arrested and charged with conspiracy, in violation of 21 U.S.C. § 846, and possession with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

Each defendant now moves to suppress the evidence recovered from the search including, as fruits of an illegal traffic stop, any statements made while alone in Detective Anderson's patrol car. Following an evidentiary hearing, Crayton requested leave to file additional briefing. For the

below reasons, the Court denies both motions to suppress and the motion requesting additional briefing.

## I.    Factual Background

After considering the evidence presented at the evidentiary hearing, as well all exhibits attached to the pertinent briefing, the Court finds as follows:[1]

Detectives in the Lake County Sheriff's Department's Highway Interdiction Unit patrol the interstate for traffic violations. Suppression Hr'g Tr., [DE 115, 34:6-17]. While conducting a routine traffic stop, HIU detectives are trained to detect fraud, wanted persons, stolen vehicles, guns, drugs, bulk cash, human smuggling, and sex trafficking crimes that may be occurring on the interstate. [*Id.*]. They are also taught to spot impaired or fatigued drivers and to help drivers that are otherwise in need of assistance. [*Id.*]. As of March 2023, Detective Timothy Anderson had been in the HIU for three years, and he had conducted over 2,000 traffic stops. [*Id.*, 72:5-11]. His training consisted of about six weeks of observation and several week-long seminars. [*Id.*, 34:20-25:1].

---

[1] This includes the following, which were admitted without objection during the suppression hearing: Gov't Ex. 1 (Det. Anderson's Outward-Facing Dash Camera Video Recording); Gov't Ex. 2 (Det. Anderson's Inward-Facing Dash Camera Video Recording); Gov't Ex. 3 (Det. Anderson's Body Camera Video Recording); Gov't Ex. 4 (Vigilant Vehicle Detection Report – College Park, Georgia); Gov't Ex. 5 (Vigilant Vehicle Detection Report – Lebanon, Indiana); Gov't Ex. 6 (Sgt. Artibey and K9 Ofc. Fena's 2021 Certification); Gov't Ex. 7 (Sgt. Artibey and K9 Ofc. Fena's 2023 Certification); Gov't Ex. 8 (Photo of Black Nissan Altima); Gov't Ex. 9 (Photo of Hertz Rental Agreement); Gov't Ex. 10 (Photo of the Nissan Altima's Front Interior); Gov't Ex. 11 (Photo of Recovered Contraband); Def. Crayton's Ex. 2 (Video Still of Instant Message Thread on Det. Anderson's Computer); and Def. Crayton's Ex. 4 (Video Still of Cell Phone). Each of the foregoing exhibits is on file with the Court and available upon request.

Defendant Crayton's Exhibit 3—instant messages between Detective Anderson and Sergeant Artibey starting at 9:01 a.m.—was admitted over the Government's objection, but Defendant Crayton was instructed to resubmit it after redacting unrelated messages. *See* [DE 105]. In deciding both suppression motions, the Court also considered messages that Detective Anderson and Sergeant Artibey exchanged prior to 9:01 a.m., which were submitted by Defendant Crayton with his motion for additional briefing. *See* Def. Crayton's Renewed Request for Addt'l Briefing, Ex. A, [DE 112-1].

On March 14, 2023, Detective Anderson was working in the drug task force division of the HIU. [*Id.*, 35:5-7]. Also on the team that day were Detective Alex Gallegos and Lieutenant Pat Fotia of the Lake County Sheriff's Department, and Sergeant John Artibey and his canine Fena of the Gary Police Department. [*Id.*, 39:9-24]. Detective Anderson and Sergeant Artibey were assigned to I-65, each alone on patrol; Detective Gallegos and Lieutenant Fotia were assigned elsewhere. [*Id.*]. That morning, Detective Anderson was parked in a turnaround near mile-marker 221, observing the northbound traffic. [*Id.*, 35:8-14]. His unmarked black patrol car was equipped with lights and sirens, and he was wearing his uniform. [*Id.*, 35:17-24].

At around 8:45 a.m., Detective Anderson spotted a black Nissan Altima with Georgia license plates that, based on his experience, appeared to be traveling faster than the flow of traffic. [*Id.*, 35:25-36:16, 87:6-88:21]. As it passed the turnaround in the far-left lane, the Altima activated its right turn signal for around 10 seconds, but it never switched lanes despite the opportunity to do so. [*Id.*, 36:17-37:1, 88:9-21]. To Detective Anderson, this was an indication that the driver was thinking about him. [*Id.*]. When it was safe, he pulled out onto the interstate to catch up to the Altima and to investigate it for speeding. [*Id.*, 37:6-9]. Due to heavy traffic, he did not reach the Altima until mile-marker 233. [*Id.*, 37:16-21].

Once behind the Altima, he paced it at around 80 miles per hour, which is 10 mph above the posted speed limit of 70 mph. [*Id.*, 38:6-10]. While he was looking for a safe place to make the traffic stop, Detective Anderson ran a search of the Altima's license plate. [*Id.*, 38:11-19, 41:21-42:4, 45:22-46:1]. From this search, Detective Anderson learned that (1) the vehicle was a rental, (2) yesterday it was near Atlanta's Hartsfield International Airport at 1:32 a.m. eastern time, and (3) earlier that morning the car was just northwest of Indianapolis, in Lebanon, Indiana. [*Id.*, 41:20-42:4, 44:5-18]; [Gov't's Exs. 4 & 5].

At 8:57 a.m. central time, Detective Anderson messaged Sergeant Artibey on an internal law enforcement messaging platform:

> **[08:57:32] Detective Anderson:** "whats your 20?"
>
> **[08:57:58] Sergeant Artibey:** "just over river"
>
> **[08:58:17] Sergeant Artibey:** "i was leap frogging down"
>
> **[08:59:00] Detective Anderson:** "k, i just crossed the river going nb. rental was in atlanta yesterday going to check it. 2 mb"[2]
>
> **[08:59:23] Sergeant Artibey:** "ok, at 233, i[']ll roll nb"

[DE 112-1, Page 7]. As he approached mile-marker 240, Detective Anderson activated his lights and directed the Altima to pull over onto the shoulder. [*Id.*, 45:22-46:19]. Once both cars were stopped, he entered into his Computer-Aided Dispatch (CAD) report the license plate of the Altima and the time: 9:01 a.m. [*Id.*, 46:9-19, 47:17-19]. At this point it had been around 16 minutes since he first saw the Altima.

The Detective then exited his patrol car and approached the Altima. [*Id.*, 47:24-48-17]. As he walked along its passenger side, he noticed two backpacks in the backseat. [*Id.*]. Through the front passenger window, he asked Crayton, who was driving, for his license and registration. [*Id.*]. Crayton apologized and provided his license and the rental agreement. [*Id.*]. Detective Anderson then asked Crayton if he knew how fast he was going, to which Crayton responded 80-85 mph. [*Id.*, 50:19-22]. As he reviewed the rental agreement, Detective Anderson noticed that this was a one-way rental from the Atlanta airport at 5:40 p.m. eastern time the day prior, set for return to Chicago's O'Hare International Airport by 11:00 p.m. that night. [*Id.*, 52:24-53:10];

---

[2] The officers were referring to the Kankakee River, which crosses I-65 near mile-marker 235. [DE 115, 40:9-22].

[Gov't's Ex. 9]. Based on his experience, a one-way rental was a potential indicator of criminal activity. [*Id.*, 51:6-14].

Detective Anderson then told Crayton he would only issue a warning, and he asked Crayton to join him in his patrol car so he could write it out in a quieter and safer setting. [*Id.*, 53:11-61:2]. Crayton complied, and the two men entered the patrol car at 9:04:34 a.m.; they left Woodberry in the Altima. [*Id.*]; [Gov't's Exs. 1-3, at 9:04:34-9:06:10 a.m.].[3] Crayton sat in the front passenger seat. [*Id.*]. Thirty seconds later, Detective Anderson activated his video recording system, which until that point had been turned off.[4] [*Id.*]. The conversation then turned to Crayton's travel plans:

> **Detective Anderson:** "So, your son lives in Atlanta?"
>
> **Crayton:** "Yeah, he used to live in Chicago, but he moved to Atlanta. He's an assistant pastor, but I don't think it's gonna work."

[Gov't's Exs. 1-3, at 9:04:34-9:06:10 a.m.]. As Crayton gave that answer, Detective Anderson pulled up his chat with Sergeant Artibey. [*Id.*]. He responded, and then continued his conversation with Crayton:

> **[09:05:36] Detective Anderson:** "10-4 ill advise"
>
> **Detective Anderson:** "How long has he been down there for?"
>
> **Crayton:** "He's actually been down there for like two years."
>
> **Detective Anderson:** "Okay. So, how did you get to Atlanta?"

---

[3] Starting at 9:04:34 a.m., all times referred to through this section reference the timestamp in the upper righthand corner of Government Exhibits 1-3.

[4] To account for such situations, the system records the 30 seconds of video prior to activation. [DE 115, 53:11-61:2]. All three video cameras here—the outward-facing dash cam, the inward-facing dash cam, and Detective Anderson's body cam—are integrated and synced. [*Id.*].

> **Crayton:** "We ended up flying to Atlanta."
>
> **Detective Anderson:** "And how long were you there for?"
>
> **Crayton:** "Just in and out. Just enough to move some boxes, give him some money and then come back."

[*Id.*]. At 9:06 a.m., while Detective Anderson was entering Crayton's driver's license information into his workstation, Sergeant Artibey arrived. He was parked about a quarter of a mile behind Detective Anderson, so as not to make Crayton nervous. [DE 115, 63:6-65:13]. Once parked, Sergeant Artibey messaged Detective Anderson that his own license plate check showed that the Altima had crossed the Indiana and Kentucky border at 1:26 a.m. eastern time. [DE 105]

(**[09:06:02] Sergeant Artibey:** "im watching ya, crossed IN/KY border at 1[:]26am"). Detective Anderson saw the message and then returned to his conversation with Crayton:

> **Detective Anderson:** "So when did you fly out there?"
>
> **Crayton:** "We flew down there yesterday morning."

[Gov't's Exs. 1-3, at 9:04:34-9:06:10 a.m.]. After a few moments of silence, Crayton complimented Detective Anderson's patrol car, which turned into a discussion about Crayton's employment. [*Id.*, at 9:06:10-9:08:15 a.m.]. Detective Anderson then picked up the rental agreement and looked at it. [*Id.*]. He asked Crayton for the name of his travel companion, and Crayton answered, "Immanuel Parsons." [*Id.*]. The Detective continued scrutinizing the rental agreement, and then sought further clarification on the pair's travel:

> **Detective Anderson:** "So, you flew into Atlanta yesterday, and you were just there for the day, basically, and then rented the vehicle?"
>
> **Crayton:** "We were supposed to be there longer than for a day… we were supposed to be helping my son move and he was supposed to come back with us . . . but he didn't want to come back."

Detective Anderson returned the rental agreement to Crayton. [*Id.*, at 9:08:15- 9:09:38 a.m.]. He then asked Crayton for additional details about the trip, and he started writing out the warning. [*Id.*]. Crayton again shared that Woodberry joined to help him and his son, a 26-year-old associate pastor, move some boxes. [*Id.*]. Crayton next offered that earlier that day, he told Woodberry not to speed, which prompted Detective Anderson to ask if the pair drove straight through the night. [*Id.*]. Crayton said that they stopped to sleep in the car. [*Id.*]. Detective Anderson relayed this to Sergeant Artibey. [DE 105] (**[9:09:38] Detective Anderson:** "flew to atlanta yesterday to help son move, driving back[.]"). Next, Detective Anderson asked Crayton why the pair chose to drive back, rather than fly. [Gov't's Exs. 1-3, at 9:09:38-9:12:17 a.m.]. While Crayton explained that it was because his son was originally supposed to drive back with them, Detective Anderson continued filling out the warning. [*Id.*]. After Detective Anderson asked which airport the pair left from, O'Hare or Midway, Crayton engaged him in conversation about growing up and living in the north suburbs of Chicago. [*Id.*]. To respond to each of Crayton's questions, Detective Anderson paused from writing out the warning. [*Id.*]. During these conversations, Detective Anderson felt he had developed enough reasonable suspicion of criminal activity to run a background check on Crayton. [DE 115, 67:23-69:3]. At around 9:11 a.m., Detective Anderson learned that Crayton had a prior conviction for drug delivery, and he shared that with Sergeant Artibey. [Gov't's Exs. 1-3, at 9:09:38-9:12:17 a.m.]; [DE 105] (**[09:12:17] Detective Anderson:** "got some sig 60 delivery on record[.]").

At 9:15 a.m., Detective Anderson completed the warning and handed it Crayton along with Crayton's driver's license. [Gov't's Exs. 1-3, at 9:12:17-9:16:12 a.m.]. Crayton then reached for the door, turned back to "fist bump" Detective Anderson, and then opened the door to leave. [*Id.*]. Then, the following exchange took place:

**Detective Anderson:** "Anything illegal in the car?"

Crayton, removed his hand from the open door and responded:

**Crayton:** "Nah, nah, nah, man."

**Detective Anderson:** "Like guns? Drugs?"

**Crayton:** "Nah, no drugs."

**Detective Anderson:** "Like heroin? Cocaine?"

**Crayton:** "No, no, no, no, no, no."

**Detective Anderson:** "Marijuana?"

**Crayton:** "No, no."

**Detective Anderson:** "Methamphetamine?"

**Crayton:** "No, no, no—we both got CDLs!"

**Detective Anderson:** "Do you have like large amounts of money in the vehicle?"

**Crayton:** "Nope."

**Detective Anderson:** "Like big bundles of money?"

**Crayton:** "Never, never."

**Detective Anderson:** "Can I search your car?"

**Crayton:** "No, you can't search my car."

**Detective Anderson:** "No? OK."

**Crayton:** "But no large amounts of money, no guns no drugs."

**Detective Anderson:** "OK, um, that's fine. You can say no. My partner is right behind me. We're gonna run our canine around your vehicle—"

**Crayton:** "Oh, you can run it. That's cool."

> **Detective Anderson:** "Yeah, we're gonna run our canine around your vehicle. And if the dog alerts to the presence of narcotics, then we'll have probable cause to search—"
>
> **Crayton:** "But they say the dog always—"
>
> **Detective Anderson:** "If the dog does not alert, then you'll be on your way."

[*Id.*]. Detective Anderson messaged Sergeant Artibey that the search request was denied. *See* [DE 105]. Sergeant Artibey asked him to remove Woodberry from the Altima so that he and Fena could conduct the drug-sniff. [*Id.*]. Detective Anderson told Crayton to wait in the patrol car, and he went to retrieve Woodberry. [Gov't's 1-3, at 9:16:12-9:17:30 a.m.]. He did not consider Crayton free to leave. [DE 115, 104:6-10]. Detective Anderson then went to Woodberry and told him that he needed to sit in the patrol car during the drug-sniff for safety purposes. [Gov't's Ex. 3, at 9:17:48-9:18:34 a.m.]. Woodberry exited the car, and Detective Anderson loosely patted down the outside of Woodberry's pants pockets and the pouch of his hooded sweatshirt. [*Id.*]. He felt some items, and he asked Woodberry what those items were. [*Id.*]. Woodberry replied that it was his wallet and phone, and Detective Anderson took him to the patrol car, where he sat him in the backseat behind Crayton. [*Id.*]. At that point, it had been 17 minutes since the stop began, and 14 minutes since Crayton first sat down in the patrol car.

At 9:19 a.m., Sergeant Artibey led Fena around the Altima. [Gov't's Ex. 2, at 9:19:05-9:21:55 a.m.]. Fena alerted at the front passenger-side window, the driver's window, and the front passenger side door. [*Id.*]. Sergeant Artibey then let her sniff inside the car. [*Id.*]. The sniff concluded at 9:22 a.m. [*Id.*]. Detective Anderson then informed Crayton and Woodberry that the positive alert gave the officers probable cause to search the car. [Gov't's Ex. 3, at 9:21:55-9:29:00 a.m.]. Crayton responded, "we have no drugs in the car." [*Id.*].

The officers found drugs in the car. [*Id.*]. Before continuing the search, the officers handcuffed Crayton and Woodberry. [*Id.*]. A grand jury indicted Crayton and Woodberry for conspiracy and possession with intent to distribute roughly 2 kilograms of cocaine, in violation of 18 U.S.C. § 846, and 18 U.S.C. § 841(a)(1), respectively. [DE 1].

## II.    Procedural Matters

Initially, Crayton moved to suppress the drugs and all statements he made in Detective Anderson's car, arguing that he faced a custodial interrogation without being *Mirandized*, the stop was pretextual, the stop was prolonged, and that the canine alert was not reliable. [DE 33]. Among its arguments in response, the Government conceded that Crayton was entitled to an evidentiary hearing on Fena's reliability. [DE 38]. Under a separate filing, Woodberry sought to join Crayton's motion. [DE 42].

The Court set the motions for a hearing on October 22, 2024. [DE 61]. On the basis that Crayton's counsel received new discovery from the Government, the hearing was continued. [DE 62]. The Court ultimately denied Woodberry's motion to join on the grounds that he did not adequately demonstrate standing to challenge the search. [DE 63]. Woodberry moved for reconsideration, which the Court set for argument at the hearing on Crayton's suppression motion. Before that hearing, Crayton's counsel moved to withdraw, and the Court appointed him new counsel on January 8, 2025. [DE 86]; [DE 87]. On January 27, 2025, Crayton's new counsel moved to continue the February 4, 2025, suppression hearing. [DE 89]. The Court granted that request, and reset the hearing for May 15, 2025. [DE 90].

Seventeen days before the May 15, 2025, hearing, Crayton's counsel moved for leave to file an amended motion to suppress. [DE 95]. Upon the Government's filing that it did not object, the Court granted the motion, and Crayton's amended motion to suppress was filed on

April 30, 2025. [DE 96]; [DE 97]; [DE 98]. The Government stood on its response to Crayton's original motion to suppress, and Crayton's new counsel did not file a reply to that response. Since the filing of Crayton's amended motion to suppress mooted his original motion, Woodberry's pending motion for reconsideration was also mooted. [DE 99]. Woodberry thus filed his own motion to suppress. [DE 100].

On May 14, 2025, a day before the evidentiary hearing, the Government moved to quash two subpoenas that Crayton's counsel had purportedly served on Detective Anderson and Sergeant Artibey on May 5, 2025. [DE 101]. After hearing argument on that motion at the beginning of the evidentiary hearing, the Court granted it. [DE 103]. During that argument, Crayton's counsel argued that the Government was purposefully withholding instant messages between Detective Anderson and Sergeant Artibey from before the traffic stop. The Government argued that messages prior to 9:01 a.m., the start of the stop, were irrelevant but ultimately agreed to provide them to defendants' counsel. After hearing testimony from Detective Anderson and Sergeant Artibey, the Court told Crayton that if, after reviewing the messages from the Government, he thought additional briefing was necessary, he could move for leave to file it.

On May 23, 2025, the Government filed a notice that it would be unable to provide the messages. [DE 106]. The Court then granted Crayton leave to file additional briefing. [DE 109]. Four days later, the Government filed a notice that its continued efforts to recover the messages were fruitful, and it tendered the messages. [DE 110]. The Court instructed Crayton that he was now returned to the original position contemplated at the suppression hearing, and that if he wished for additional briefing, he would need to request it after reviewing the messages. [DE 111]. He did so. [DE 112]. In addition to both motions to suppress, that motion is also pending

before the Court and ripe for decision. Given the many moving parts, the Court separates its analysis by defendant.

### III.    Defendant Crayton

Crayton argues that Detective Anderson and Sergeant Artibey unreasonably prolonged the traffic stop to allow for the arrival of a drug-sniffing dog and detained him after the mission of the traffic stop was complete. Each action, he contends, violates his Fourth Amendment rights that independently justifies the suppression of all evidence. Crayton's first argument is based on his contentions that the traffic stop started earlier than 9:01 a.m., and that Detective Anderson purposefully delayed issuing the warning so that Sergeant Artibey could arrive on scene. Crayton anchors his second argument on his belief that the stop's mission was completed once Detective Anderson returned his personal effects. Consequently, Detective Anderson's subsequent questioning of Crayton amounts to an unsupported, and therefore unlawful, detention.

The Government argues that the stop began at 9:01 a.m., therefore, anything occurring beforehand is irrelevant in determining whether the stop itself was prolonged. Aside from that, Detective Anderson developed independent reasonable suspicion of other criminal activity well-within the reasonable time it takes to issue a warning for speeding. Moreover, the facts he funneled through the prism of his experience were each a natural result of actions related to the original mission of the traffic stop, and those facts supported independent reasonable suspicion to detain Crayton.

### A.  Crayton's Motion to Suppress [DE 98]

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is

reasonableness[,]" which is "measured in objective terms by examining the totality of the circumstances." *Lange v. California*, 594 U.S. 295, 301 (2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

### i.    *Lawfulness of the Initial Traffic Stop*

Though "Crayton does not contest that Detective Anderson lawfully initiated the stop for speeding," portions of his motion, and certain arguments he raised at the evidentiary hearing, call the sincerity of this concession into doubt. [DE 98, Page 8]. For example, on the one hand, Crayton's motion states that he was pulled over at 9:01 a.m. and also that he and Detective Anderson enter the police car at 9:04:34 a.m., when the body camera is first activated. [*Id.*, Pages 1-2]. At the same time, he asserts that 10 to 13 minutes passed from when he was pulled over to when he sat in the patrol car. [*Id.*]. At the hearing, he doubled down on this, stating that he needed additional discovery of communications between the officers from before the stop to demonstrate that it began earlier than 9:01 a.m. [DE 115, 19:24-20:10]. Since Crayton's motion argues only that the stop was unnecessarily prolonged and that Detective Anderson's investigation impermissibly exceeded the mission of the stop, the Court begins by resolving any confusion around whether the initial stop was lawful.

A traffic stop is a seizure; thus, it must be reasonable under the circumstances. *Wren v. United States*, 517 U.S. 806, 809 (1996). At bottom, a reasonable traffic stop is "justified at its inception, and reasonably related in scope" to the grounds for the stop in the first place. *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 185 (2004). Since a routine traffic stop is "a relatively brief encounter," it is "more analogous to a so-called *Terry* stop . . . than to a formal arrest." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quotation and citation omitted). Because traffic stops are like *Terry* stops, only reasonable suspicion of a traffic

violation—not probable cause—is required to justify the stop. *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (citations omitted).

Setting aside the concession in Crayton's briefing, first in his motion to suppress and later in his motion for additional briefing, he admits to Detective Anderson that he was speeding. *See, e.g.*, [DE 115, 49:22-50:1]. But even removing this admission from the set of facts considered by Detective Anderson, the Court would still find that there was sufficient reasonable suspicion to support a traffic stop. In the absence of contrary evidence, the Detective's testimony on the matter was credible. At the time of the stop, it was his third year on the HIU, and he had conducted roughly 2,000 traffic stops. Such experience lends considerable weight to his testimony that he perceived Crayton to be traveling "faster than the flow of traffic." Moreover, rather than turn his lights on right away and initiate a stop based solely on his own perception, he paced, which demonstrates his desire to gather an additional, and more reliable indicator, that it was speeding. At the risk of belaboring the point, even if Detective Anderson used a speeding violation as pretext to investigate his own subjective belief that some other criminal activity was afoot, that would not render the stop unreasonable. *See Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014) ("The Fourth Amendment permits pretextual traffic stops as long as they are based on an observed violation of a traffic law.") (citing *Wren*, 517 U.S. at 810). Ultimately, Crayton's unlawful speeding was all that was necessary for Detective Anderson to initiate the traffic stop. For these reasons, the Court finds that the initial stop was lawful.

This leaves one unanswered question concerning the initial stop: what time the stop began for the purpose of determining whether it was unnecessarily prolonged. "A lawful roadside stop *begins* when a vehicle is pulled over for investigation of a traffic violation." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (emphasis added). Though Crayton later concedes in his

motion for additional briefing that the stop began at 9:01 a.m., the Court confirms this start time here to emphasize that events occurring before that time are irrelevant in determining whether the stop was unnecessarily prolonged.

### ii.    *Lawfulness of the Drug-Sniff & Search*

With the lawfulness of the initial stop established, the Court turns to Crayton's stated arguments: that the stop was unnecessarily prolonged and that questioning of Crayton after the warning was issued exceeded the mission of the traffic stop. Both arguments rest on the assumption that Detective Anderson's reasonable suspicion of independent criminal activity arose outside of activities "reasonably related in scope" to the grounds for the stop in the first place. *Hiibel*, 542 U.S., at 185; *see also Rodriguez*, 575 U.S., at 355 ("An officer . . . may not [conduct certain, unrelated checks during an otherwise lawful traffic stop, e.g., a dog-sniff], in a way that prolongs the stop, *absent the reasonable suspicion* ordinarily demanded to justify detaining an individual.") (emphasis added). Whether that assumption is true requires examining at what times certain facts became available to Detective Anderson, and whether he prompted those revelations in a manner that goes beyond the dutiful investigation of a traffic violation.

Crayton is correct that when he "fist-bumped" Detective Anderson that the stop, as it related to his speeding, had concluded. But Detective Anderson's questioning about the contents of the Altima, and his decision to conduct a dog sniff, were tied to a separate calculus of reasonable suspicion of independent criminal activity. At the hearing, he testified that some time before 9:11 a.m., he felt he had reasonable suspicion to prolong the traffic stop. [DE 115, 67:23-69:3]. The Court agrees. Up until he ran a background check on Crayton, each fact available to Detective Anderson arose from tasks related to the mission of the original stop. The Court addresses these facts in turn.

### a.  Initial License Plate Check

Though an automobile is an effect subject to the protections of the Fourth Amendment, there is a diminished expectation of privacy in one's automobile. *See Scholl v. Illinois State Police*, 2025 WL 964143, at *7-8 (N.D. Ill. Mar. 31, 2025) (citations omitted). Since "license plates are, essentially, government IDs," there is no privacy interest in them. *See id.* (quotations and citations omitted). While Detective Anderson, in consideration of his safety and the safety of the Altima's occupants, was waiting for a safe place to initiate the traffic stop, he ran a search of Crayton's license plate. He testified that his practice is to run such searches before initiating a traffic stop so he can get an idea where the vehicle is coming from. It also allows him to see if a driver is truthfully answering his basic questions about their travel. Here, the license plate check revealed that the car was (1) a rental, (2) that had been in Atlanta the day before, and (3) was near Indianapolis just an hour prior. These facts, alone, might be enough for reasonable suspicion of criminal activity. *Kansas v. Glover*, 589 U.S. 376, 385 (2020) ("[O]fficers, like jurors, may rely on probabilities in the reasonable suspicion context."). Coupling them with Detective Anderson's experience at the time, which included over 2,000 traffic stops, makes the case for reasonable suspicion here even stronger. But, for the sake of argument, the Court will find that it does not yet get there.

### b.  Initial Contact with Crayton

"[T]he mission of a traffic stop involves 'address[ing] the traffic violation that warranted the stop and attend[ing] to related safety concerns.'" *United States v. Devalois*, 128 F.4th 894, 898 (7th Cir. 2025) (quoting *Rodriguez*, 575 U.S., at 354). "Police may check the driver's license, seek the vehicle's registration, request proof of insurance, and investigate whether there are warrants out for the driver's arrest." *Devalois*, 128 4th, at 898-99 (citations omitted). Upon

stopping the Altima, Detective Anderson asked Crayton for his driver's license and registration: two actions related to the reason for the stop. When Crayton provided the rental agreement in lieu of the registration, Detective Anderson learned that the car (1) was rented in Atlanta at 5:40 p.m. eastern time the day before, and (2) was a one-way rental to be returned in Chicago that night. Gov't's Ex. 9. If, before adding these facts to his calculus, he did not have reasonable suspicion, he certainly did by this point. That does not mean there was enough evidence of a crime, but only that he was justified in detaining Crayton on a basis other than the traffic violation in order to further investigate.

### c. Crayton's Travel Plans

"An officer may also ask the driver questions pertinent to the stop, including questions related to travel plans." *Devalois*, 128 4th, at 898-99 (citing *Cole*, 21 F.4th, at 430). Other conduct, such as asking questions unrelated to the stop and conducting a dog sniff, are only allowed if they do not prolong the *traffic* stop. *See id.* "[T]ravel-plan questions supply important context for the violation at hand." *Cole*, 21 F.4th, at 429. "A driver's travel plans may also inform an officer's assessment of roadway safety concerns beyond the immediate violation." *Id.*

As can be seen above, with each answer Crayton gave to Detective Anderson's questions about his travel plans, reasonable suspicion grew stronger. By around 9:09 a.m., roughly 8 minutes into the stop, the following additional facts were now known to Detective Anderson: Crayton and Woodberry (1) flew to Atlanta the day before, (2) to help Crayton's adult son move a few boxes across town, and (3) drove back through the night. These answers were all the result of questions Detective Anderson was entitled to ask pursuant to the suspected speeding violation.

Here, Crayton's argument that there is nothing suspicious or unlawful about a parent helping a child move falls flat. Crayton is right that the mere act of helping a child or relative

move is not, by itself, suspicious. The suspicion here arises from the combination of the travel plans, the story, and the time spent in Atalanta. Detective Anderson was rightfully skeptical that a father would fly to help his adult son move "a couple of boxes," stay for a few hours, and then drive back through the night. The reason Crayton gave for driving back was that his son was supposed to come back with them. To Detective Anderson, that did not adequately explain away his suspicions. It does not do so for the Court, either.

With reasonable suspicion of separate criminal activity surely in hand, the Court need not address the additional information Detective Anderson gathered, such as Crayton's criminal history and the Altima crossing the Indiana and Kentucky border at nearly midnight. The Court finds that Detective Anderson had adequate reasonable suspicion to detain Crayton and ask him whether there was contraband in the car. With Sergeant Artibey and Fena being on scene only 5 minutes into the stop, the stop was not prolonged for their arrival and the 3-minute free-air sniff and its resulting search were lawful. Accordingly, the Court finds the initial stop was not prolonged, and that Crayton was not unlawfully detained. Given Fena's alert, the officers had probable cause to search the vehicle without a warrant under the automobile exception to the warrant requirement. *See United States v. Ostrum*, 99 F.4th 999, 1005-06 (7th Cir. 2024). As that search was lawful, Crayton's motion to suppress the cocaine, and any statements he volunteered in Detective Anderson's patrol car, is denied.

### B.  Crayton's Renewed Request for Additional Briefing [DE 112]

On January 31, 2025, the Court reset the suppression hearing for May 15, 2025. [DE 90]. Just a few weeks before the hearing, on April 30, Crayton filed an amended motion to suppress. [DE 98]. On May 5, 2025, 10 days before the hearing, Crayton subpoenaed Detective Anderson and Sergeant Artibey, seeking any and all records related to the arrest to be produced by the day

of the hearing. [DE 102, Page 2] (Def.'s Resp. Gov't's Mot. Quash). The Government moved to quash the subpoenas on May 14, 2025, asserting that Crayton's counsel notified it of the subpoenas on May 13, 2025. [DE 101]. To start the evidentiary hearing, the Court heard argument on the Government's motion. During that argument, Crayton specified that he sought all communications between Detective Anderson and Sergeant Artibey prior to 9:01 a.m. because, at that time, he asserted that the stop had started earlier than that. After the Court granted the Government's motion, Crayton made a more specific request: for electronic communications records between the officers from 8:45 a.m. to 9:04 a.m. The Government agreed to produce those messages. At the conclusion of the hearing, Crayton requested leave to file post-hearing briefs. The Court denied the request, but it told Crayton that if the Government could not produce the promised messages or the messages revealed something that warranted additional briefing, the Court would grant a motion for leave to file such papers. The Government filed a notice that it could not deliver on its promise concerning the pre-stop messages. [DE 106]. Initially, the Court granted Crayton's motion for leave to file additional briefing. [DE 109]. But the Government subsequently filed a notice that, through its continued efforts, it was able to recover the messages. [DE 110]. Now that the grounds upon which the Court granted Crayton's motion for leave no longer existed, that motion became moot. [DE 111]. However, the Court stated that if the messages reveal something compelling, the Court would afford Crayton leave to file additional briefing, as originally promised. [*Id.*].

After reviewing the text messages, Crayton moved for leave to file additional briefing, stating that "the messages do not show that the stop began earlier than the officers said," but that one message reveals that "this was a racially pretextual stop, and that pretext explains Detective Anderson's illegal delay tactics." [DE 112, Page 1]. The message in question was: "k, i just

19

crossed the river going nb. rental was in atlanta yesterday going to check it. 2 mb." [DE 112-1, Page 3]. Crayton contends that "[t]he messages were intentionally withheld from the defense before the suppression," which is a *"Brady/Giglio* violation." [DE 112, at Page 2]. Finally, he argues that Detective Anderson testified at the hearing that he attended a "Street Cop" training, where he was likely taught unlawful traffic stop practices. [*Id.*, at Pages 1-2]. Because the messages were withheld, Crayton asserts that he was unable to cross-examine Detective Anderson on the "racially inflammatory language" of the one message. [*Id.*].

The Government contends that this message is not material to Fena's alert, and therefore, it is not a basis for suppression or further briefing. [DE 114, at Pages 4-5]. Further, the law renders the Detective's subjective motivations irrelevant. [*Id.*, at Page 6]. Moreover, Crayton's attempt to tie the message to the training the Detective attended is futile, given that he attended the training 9 months after the stop. [*Id.*]. The Government states that it did not withhold the text messages, as it tendered all information relevant to Crayton's motion challenging the stop that started at 9:01 a.m. [*Id.*, at Page 7]. The Government does not believe that the text message constitutes *Brady* material, which is exculpatory, or *Giglio*, which relates to impeachment of a witness. [*Id.*]. Crayton responds that Detective Anderson's behavior would be the model behavior presented at an unconstitutional "Street Cop" training session, and that is what should count here. [DE 116, Page 4]; *see also* [DE 116-1] (Def.'s Ex. A) (a police accountability report on unregulated private police training).

As a threshold matter, at no time between taking over the case on January 9, 2025, and the filing of Crayton's amended motion to dismiss on April 30, 2025, did Crayton's counsel raise the purported discovery dispute to the Court. Instead, counsel issued subpoenas 10 days prior to the hearing. There was ample time to raise any potential discovery dispute before the amended

suppression motion was ultimately filed. Especially since Crayton was afforded leave to file an amended motion to suppress, rather than be tied to his original motion. He has been given a fair opportunity to develop and present his arguments for motion to suppress.

With regards to the text message itself: though technical, the Court points out that all parties are assuming that "2 mb" means "2 males black." Though that is a reasonable assumption given the context, it is not in evidence. Regardless, Crayton would have asked the question if he had the opportunity, and given that he was the first to offer that "2 mb" translates to "2 males black" the Court adopted his interpretation in its inclusion of the additional text messages for the purpose of deciding the motion to suppress.

In arguing that the text message carries impeachment value, Crayton cites a case from the Pennsylvania district courts. In *Fenico v. City of Philadelphia*, police officers' social media posts expressing racial bias were deemed to be within the sweep of the Government's obligations under *Giglio*. 755 F. Supp. 3d 602 (E.D. Pa. 2024). One of the posts, for example, likens someone wearing religious attire to a black garbage bag. *Id.*, at 626. That is not this. The instant message here only includes readily apparent traits for the purpose of identification. This is allowable, especially since it is paired with other relevant information, e.g., the car is a rental from Atlanta. *See United States v. Street*, 917 F.3d 586, 596 (7th Cir. 2019) (noting that "race and sex are basic and common elements of descriptions of people[,]" and that officers are not expected to "ignore such defining features."). The Court agrees with the Government that visual identifiers such as race, gender, age, height, and weight are neutral pieces of information that aid officers in locating and identifying a subject, or providing a trail to fellow officers should something happen to an officer responding to an incident without backup.

As for Crayton's contention that Detective Anderson attended "Street Cop" training that included unconstitutional practices, the Government's response attached a certificate demonstrating that Detective Anderson did attend such a training, but in December of 2023: 9 months after Crayton's arrest. [DE 114-1]. Consequently, not having the pre-9:01 a.m. messages at the hearing did not prejudice Crayton. Even if he had the messages, and further questioned Detective Anderson on his street cop training, the Court returns to the toughest hurdle for Crayton: the subjective motivations of Detective Anderson do not matter. Admitting the speeding violation and then conceding that the stop did not start prior to 9:01 a.m. necessarily forecloses the argument that something from before the stop renders it unlawful. The Court included the messages in its above analysis of the suppression motions and afforded Crayton his interpretation of "2 mb" for that reason: to show that there is not a set of facts here that, with additional briefing, would change the outcome of Crayton's motion to suppress. For these reasons, the Court denies Crayton's request to file additional briefing.

### C. Additional Matters

#### i. *Crayton's Attempted Use of* Giglio *Material*

In late September 2024, the Government provided to both defendants, under seal, information concerning two instances of off-duty conduct for which Sergeant Artibey was disciplined. [DE 58]. One incident occurred in 2010, and the other occurred a month *after* Crayton's and Woodberry's arrests. [DE 53-2]. Though the Government did not believe these instances to be relevant under Federal Rule of Evidence 401, or able to be used under Rules 608(b) and 609, it tendered the incident reports as potential *Giglio* material out of an abundance of caution. At the hearing, Crayton's counsel questioned Sergeant Artibey as follows:

> **Counsel:** And you have been a police officer since before 2007, correct?

**Sergeant Artibey:** Yes, ma'am.

**Counsel:** And I think I heard you testify that you're currently working a shift from 4:00 until 12:00 noon?

**Sergeant Artibey:** 4:00 p.m. to 12:00 a.m.

**Counsel:** Pardon me. Thank you for that correction. Was that your time frame for working on March 14, 2023?

**Sergeant Artibey:** No. That's when – this is my current position in the patrol division. On March 14, [2023,] I was assigned to the Lake County drug task force highway interdiction unit, and we primarily worked a day schedule. The hours would fluctuate 6:00 a.m. to 2:00 p.m. or 7:00 a.m. to 3:00 p.m. depending on what we had going on.

**Counsel:** Do you recall what your shift was that day?

**Sergeant Artibey:** No, I don't. But it would have been a day turn shift though.

**Counsel:** And what are the possibilities for a day turn shift?

**Sergeant Artibey:** 7:00 to 3:00.

**Counsel:** So you were likely working that day starting at 7:00 a.m.?

**Sergeant Artibey:** Yes, ma'am.

**Counsel:** You were involved in a SWAT shooting in January of 20—

[DE 115, 161:18-162:14]. Counsel was cut off by the Government objecting to the relevance of the testimony. Crayton argued that this was relevant because the report about Sergeant Artibey's conduct in April 2023 details that the conduct stemmed from being negatively impacted by a work-related shooting in January 2023. He further argued that given that the Government bolstered Sergeant Artibey's reputation, Crayton should be allowed to explore the April 2023 incident.

The Court sustained the objection on the grounds that the Government had not bolstered Sergeant Artibey, and the line of questioning was irrelevant as to the reliability of Fena's alert. Since "the trial judge is best positioned to assess [the materiality of] *Brady/Giglio* evidence in full context," this ruling was within the Court's discretion. *See United States v. Johnson*, 126 F.4th 546, 555-56 (7th Cir. 2025) (affirming a district court's conclusion that FBI agents' romantic relationship was immaterial). Sergeant Artibey's testimony on direct examination related to the training and reliability of Fena, his training and experience as her handler, and his recollection of Fena's alert on the day in question. [DE 115, 139:13-158:3]. No foundation was laid by counsel tying the January 2023 officer shooting, which purportedly related to the April 2023 incident, to the testimony concerning Fena's reliability and alert.

## IV. Defendant Woodberry

### A. Woodberry's Motion to Suppress [DE 100]

Woodberry separately moves for the suppression of all the fruits of the stop on the grounds that the stop was impermissibly prolonged to allow for a drug-sniffing dog. [DE 100, Page 3]. For the most part, however, he raises many of the same arguments as Crayton. He independently argues that he was unlawfully taken into custody prior to Fena's free-air sniff, that there was no objective evidence that Fena alerted to the presence of drugs, and that neither he nor Crayton consented to the interior search of the vehicle. [*Id.,* at Pages 5-6].

"The Fourth Amendment's protections are 'personal rights' that 'may not be vicariously asserted.'" *United States v. Rodriguez-Escalera*, 884 F.3d 661, 667 (7th Cir. 2018) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133-134 (1978). Typically, a passenger lacks a legitimate expectation of privacy in a searched vehicle, unless the passenger can show some possessory interest in it. *Rodriguez-Escalera*, 884 F.3d, at 667 (citations omitted). In this Circuit, however, a

24

"a person listed on a rental agreement as an authorized driver has a protected Fourth Amendment interest in the vehicle and may challenge a search of the rental vehicle." *United States v. Walker*, 237 F.3d 845, 849 (7th Cir. 2001). A passenger also has standing to move for the suppression of evidence derived from an unlawful traffic stop, since such a stop seizes all vehicle occupants. *Brendlin v. California*, 551 U.S. 249, 255-59 (2007). Even so, an officer making a traffic stop may order passengers to get out of the car, and the officer may perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous. *See Johnson*, 555 U.S., at 331-32.

Both Crayton and Woodberry assert that Woodberry is listed on the rental agreement, and thus, has an expectation of privacy in the areas searched. Since the Government has withdrawn its earlier objection to Woodberry's asserted standing, he may properly move to challenge the search in this instance. For the reasons discussed in the analysis of Crayton's motion, Woodberry's argument that the initial stop was invalid fails. His contention that the stop was unnecessarily prolonged also fails for those reasons. The Court, therefore, need only address Woodberry's argument that he was unlawfully taken into custody prior to the sniff, there is no evidence of an alert, and that neither he nor Crayton consented to the search of the vehicle.

By the time Detective Anderson went to retrieve Woodberry from the Altima, he already possessed reasonable suspicion that other criminal activity was afoot. He conducted a very loose patdown of Woodberry, and he moved him to his patrol car until Fena completed her sniff. Pursuant to *Johnson*, Detective Anderson was entitled to take each of these actions. As for Fena, on cross examination Sergeant Artibey testified that she "hasn't had false alerts." [DE 115, at 174:20-175:9]. He explained that even in instances where no drugs were found, it was later learned that drugs were recently in the car. [*Id.*]. Moreover, Sergeant Artibey's training method,

of being consistently inconsistent, was designed to limit the possibility that he would subconsciously cue Fena to alert. [*Id.*, at 175:22-176:11]. Fena is certified, has participated in multiple trainings, and has been in the field with Sergeant Artibey for several years without incident. [*Id.*, at 139:13-158:3]. On this testimony, the Court finds that Fena's training and background supports the reliability of her alerts.

In this case, the entire drug-sniff is captured on Detective Anderson's outward-facing dash camera. [Gov't Ex. 2, at 9:19:05-9:21:55 a.m.]. Fena is seen excitely pulling Sergeant Artibey towards the car, which forced him to use his hand to direct her into a more controlled sniff. [*Id.*]. As they circle the car, she jumps at the front passenger window, again at the front driver's side window, and as they complete their loop, she sits at the front passenger door. [*Id.*]. Sergeant Artibey continues walking and pulls the leash, but Fena does not budge. [*Id.*]. He explained at the hearing that these were alerts, and the Court finds that testimony credible. Finally, "[i]t is well-established, however, that the use of a drug-sniffing canine in the course of a traffic stop does not constitute a search, and therefore does not in itself violate the Fourth Amendment, although it may impact the determination of whether a seizure is reasonable if the use of the dog causes a delay." *See United States v. Taylor*, 596 F.3d 373, 376-77 (7th Cir. 2010). Though Crayton denied Detective Anderson's request to search the Altima, he did give his consent for the free-air sniff. Even if he had not given that consent, Detective Anderson had reasonable suspicion of other criminal activity that justified the use of the drug-sniffing dog in this instance. Given that Fena was certified, and the record demonstrates her reliability in controlled settings, the Court may presume that the alerts during her search were reliable, and therefore, provided the officers with the probable cause necessary to search the car. *Florida v.*

*Harris*, 568 U.S. 237, 247-48 (2013). For all these reasons, Woodberry's challenges to the stop and search fail, and his motion to suppress is therefore denied.

## **CONCLUSION**

Accordingly, for the reasons stated in this Opinion and Order, Defendant Crayton's Motion to Suppress [DE 98] is **DENIED**; Defendant Woodberry's Motion to Suppress [DE 100] is **DENIED**; and Defendant Crayton's Renewed Request for Additional Briefing [DE 112] is **DENIED**. By separate order, the Court will set this matter for trial.

SO ORDERED.

ENTERED: July 18, 2025

/s/ GRETCHEN S. LUND
Judge
United States District Court

27